UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| DEWAYNE HIGDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:04-CV-064 WCL |
| | ) | |
| WELLS COUNTY SHERIFF'S OFFICE | ) | |
| BLUFFTON POLICE DEPARTMENT, | ) | |
| RYAN MOUNSEY, RANDY STEELE, | ) | |
| GREG STEELE, KYLE RANDALL, and | ) | |
| BRENT ARCHBOLD | ) | |
| | ) | |
| Defendants | ) | |

**OPINION AND ORDER**

Before the Court are two Motions for Summary Judgment filed by defendants.  The first

motion was filed on November 7, 2005 by defendants  Bluffton Police Department, Greg Steele,

Kyle Randall, Brent Archbold, and Farrell Swindell (collectively, "the Bluffton Officers").  A

second summary judgment motion was filed on November 16, 2005 by the Wells County Sheriff's

Office, Ryan Mounsey, and Randy Steele (collectively, "the County Defendants").  Plaintiff,

Dewayne Higdon ("Higdon"), responded jointly to the motions on December 19, 2005 to which the

Bluffton Defendants replied on January 3, 2006 and the County Defendants replied on January 13,

2006.  For the following reasons, the defendants' motions will be GRANTED in part and DENIED

in part.

**Factual Background**

On February 20, 2004 at approximately 4:50 p.m. Deputy Randy Steele ("Steele") of the

Wells County Sheriff's Department served a felony arrest warrant for Higdon at 201 East Townley

1

Street, Bluffton, Indiana.  Higdon resided at that home and paid rent to its owner, Keith Archbold ("Archbold")[1], who also resided there.

When Deputy Steele arrived at Higdon's residence, he approached the back door of the home which was situated on a wooden deck and rang the doorbell.  The back door opens into an enclosed back porch that is being converted into a utility room.  A black curtain separated the back porch/utility room from the interior of the house.

Archbold answered the back door and Deputy Steele indicated that he was looking for Higdon.  Archbold told Deputy Steele that Higdon was inside the home and told him to wait outside the back door while he located Higdon.  (Archbold Dep. at 51).

A few minutes later,  Higdon arrived at the door and Deputy Steele confirmed his identity. Deputy Steele informed Higdon that he was under arrest. Higdon responded "okay" and requested to put on his shoes which were within a few feet of the back door.  At that point, Deputy Steele entered the residence and walked past Higdon into the middle room of the home and eventually into the kitchen. (Higdon Dep. at 34; Archbold Dep. at 54).  Archbold then asked Deputy Steele what he was doing and Deputy Steel responded that  he could smell marijuana while standing at the back door and thus, he entered to investigate further.  (Archbold Dep. at 54).  Both Archbold and Higdon told Deputy Steele he had no permission to enter the house and told him to leave.  Deputy Steele then handcuffed Higdon and told him to sit at the kitchen table.  According to Higdon's testimony, "Mr. Steele stood in the kitchen with me – or stood in the kitchen area where I was sitting, I believe, the whole time."  (Higdon Dep. at 34-35).  Deputy Steele then radioed for backup.  (Archbold Dep.

---

[1]There are two Archbold surnames in this case.  The Defendant Bluffton Police Officer Brent Archbold will be referred to throughout as Officer B.Archbold to avoid confusion.

at 55).

While this was ongoing, officers from the Bluffton Police Department began arriving on the scene.  At 4:54 p.m., Bluffton Police Detective Kyle Randall arrived at Higdon's residence.  Within the next several minutes, other Bluffton Police Officers, including defendant Officers Swindell and Brent Archbold ("Officer B.Archbold"), arrived at the residence as well.

When the Bluffton Officers entered the residence, they too averred that they smelled the odor of marijuana and, in addition, they observed what they believed to be several burnt marijuana cigarettes, a small amount of a green leafy substance believed to be marijuana, and drug paraphernalia, including an aluminum cylinder, all in plain view on a table in the living room. (B.Archbold Aff. at ¶9, Swindell Aff. at ¶9, Randall Aff.at ¶9).  During this time both Archbold and Higdon (still handcuffed) were sitting in chairs in the kitchen.

From this point onward, there exist two different versions of the facts.  According to the Defendants,  Deputy Steele began calling to obtain a search warrant.  Because of the unavailability of a judge, he was unable to immediately obtain a search warrant but was advised by the Wells County Prosecutor that the officers could seize contraband in plain view.  Following this advice, the Bluffton officers allege that they seized several burnt marijuana cigarettes, a small leafy substance believed to be marijuana and a pair of hemostats with burnt ends.[2]  Other than to seize the drug-related items, the officers aver that they did not  remove any other items from the residence nor

---

[2]Higdon testified that he observed the Defendants remove ashes from an ash tray in the living room.  However, he testified that the ashes came from the officers' own cigarettes and not from anyone living in the residence.  The residence has a "no smoking" sign at the entrance and, according to Higdon, no one smokes inside the home.  He also testified that the Defendants removed an aluminum cylinder that was sitting on the table in the living room.  Higdon stated that the cylinder was part of a race car and that at the time Deputy Steele arrived he had been waiting for "some people to bring me some parts" for an engine (Higdon Dep. at 69-70).

3

did they conduct a full-scale search of the residence.  Further, they aver that they saw no Bluffton

Officer or officers of  the Wells County Department, conduct a search of the residence.

In contrast to the Defendants version of the above facts, there is testimony in the record from

Higdon and Archbold that the officers on the scene did more than observe objects in plain view and

seize them.  According to Higdon and Archbold, the officers conducted a full scale search of the

residence without a warrant.  (Higdon Aff. ¶38).  In his deposition, Higdon described the events as

follows:

> Other Officers had came into the house.  I know there was an Officer Archbold, I
> know that – in what sequence, who came in where, I don't know.  I saw Kyle
> Randall, I saw Mounsey, Officer – Deputy Sheriff Mounsey, I saw Officer Swindell,
> and I believe it was Officer Mounsey go toward the front of the house, toward the
> living room.  And, there again, I am not 100 percent sure, because it could have been
> the other Officer Steele [Officer Greg Steele] and it could have been the Archbold
> officer, I don't know .Two officers went into the front.  I was watching them through
> the doorway.  Officer Steele stood in the doorway, tried to block my view, and then
> when ... Archbold would look from the other side, he would try to block his view, but
> we could clearly see that they were going through things inside the house.  They
> went into – I seen them open my dresser drawers, I asked them what they were doing
> in my room, I explained to them that I didn't want them going through my property.
> They  said  they  had  the  right  to  do  what  they  want  because  they  had  a
> warrant...Officer [B.]Archbold arrived, and I believe Steele walked me to the back
> door, out onto the back porch, where he then handed me over to Archbold. [Officer
> B.] Archbold put me in a car, and we left.  I went in there, straight into the jail,
> posted the bond and came back.  When I came back, I saw Officer Randall, Officer
> Steele, and one other officer, and I believe it could have been Mounsey, looking on
> the workbench and into vehicles that were sitting in the driveway and inside the
> garage when I walked up.

(*Id.* at 34-36).

Archbold testified similarly to Higdon and stated that Officers Greg Steele,[3] Randy Steele

and  B. Archbold "just started looking around in the house."  (Archbold Dep. at 18).  According to

---

[3]There is considerable dispute in the record about whether Officer Greg Steele was present at the
events at all.  Both Higdon and Archbold affirmatively state that he was present.  All of the defendant
Officers indicate that he was not present.  The police records indicate that he was not on duty that day.

Archbold he "seen [sic] an officer standing here in the doorway of [Higdon's] bedroom, and the other one was in here looking around. I heard the cabinet drawer open, the big metal cabinet, I heard it open. And the dresser was right here. I heard the dresser drawers open." (*Id.* at 19).

At some point, Higdon was taken to jail, posted bond, and returned to the house. Higdon and Archbold testified that upon Higdon's return from jail, the Defendant officers were still at the residence searching through the garage. It is unclear whether officers were still inside the home. Higdon contends that the officers were present at the residence for approximately four hours, although the Defendants appear to contend that they were present for only 2 hours.

Approximately two hours prior to Deputy Steele's arrival to execute the arrest warrant, Higdon's brother had dropped by the home and given him $2,000 in cash which Higdon placed in his dresser in his bedroom. After his arrest, Higdon claims that this money was missing and that one of the defendants must have removed it. However, Higdon has not identified which, if any, of the officers he believes to have taken this money nor did he witness any of the defendants removing the money from the premises. Moreover, all of the defendants deny that money was removed from the residence.

Based upon these facts, Higdon filed suit claiming that the actions of the defendants infringed upon his constitutional rights under the Fourth, Fifth, Eighth and Fourteenth Amendments in violation of 42 U.S.C. § 1983. The Defendants have filed their motions for summary judgment arguing that Higdon cannot establish a constitutional violation and, even if he did, the Defendants are entitled to qualified immunity. After review of the standards governing summary judgment, these contentions will be considered.

**Summary Judgment Standards**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 2512; *In Re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir. 1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir. 1988); *Valentine v. Joliet Township High School District No. 204*, 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992)(quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986)).

Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute because the issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id*. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512. Mindful of these

6

principles the court turns now to the parties' contentions.

## Claim under 42 U.S.C. § 1983

As noted above, Higdon contends that the Defendants violated his constitutional rights by conducting an unlawful search and seizing $2,000 he had on his dresser.  Section 1983 is not a source of substantive rights but instead provides "a method for vindicating federal rights elsewhere conferred."  *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 811 (1994).  To prevail on a claim under section 1983, plaintiff must therefore show "(1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law."  *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996); *see also, Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913 (1981); *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923 (1980).

Suit may be brought against individual officers in either their official or individual capacity or both.  The distinction is telling because where suit is brought against an individual in his official capacity it is really a claim against the municipality, *see, Gossmeyer v. McDonald*, 128 F.3d 481, 494 (7th Cir. 1997), and hence a plaintiff must show that the municipality maintained an express policy of depriving its citizens of their constitutional rights, *see, McTeague v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995), that its practice of depriving citizens of their constitutional rights, though not authorized or not written, was so widespread so as to have the force of law, *Board of County Comm'n of Bryan v. Brown,* 117 S.Ct. 1382, 1388 (1997), or that the individual in question was a person with final policymaking authority who made a deliberate choice to either deprive plaintiff of some constitutional right, *see, West v. Waymire*, 114 F.3d 646, 651-52 (7th Cir) *cert. denied*, 118 S.Ct. 337 (1997), or acquiesced in such a deprivation turning a "blind eye for fear of

7

what [he] might see, *Lincoln v. Village of East Hazel Crest*, 110 F.3d 467, 477 (7th Cir. 1997).

Insofar as this may be deemed a suit against the defendants in their official capacity, it is clear that they are entitled to judgment on the same.  The record is bereft of any evidence, and the plaintiff concedes as much in his brief, that either the Bluffton Police Department or the Wells County Sheriff's Office maintained an express policy of depriving its citizens of their constitutional rights, let alone that its practice of depriving citizens of their constitutional rights was so widespread so as to have the force of law as would be required to establish an official capacity claim. Accordingly, the Defendants motions for summary judgment as to these entities is GRANTED.

This leaves Plaintiff's individual capacity claim against the individual officers at the scene under the Fourth, Fifth, Eighth and Fourteenth Amendments.   Plaintiff concedes that the facts support neither a Fifth or Eighth Amendment violation.  Thus, he must rely on the Fourth and Fourteenth Amendments to establish a constitutional violation to support his §1983 claim.  To that end, Higdon asserts that  the individual officers violated the Fourth Amendment by conducting a warrantless search of his residence and they violated the Fourteenth Amendment by seizing the money on his dresser. These claims will be addressed in turn.

**Fourth Amendment**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." "At the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States,* 365 U.S. 505 (1961).  The touchstone of Fourth Amendment inquiry is reasonableness, a standard measured in light of the totality of the circumstances and determined by balancing the degree to which a

8

challenged action intrudes on an individual's privacy and the degree to which the action promotes

a legitimate government interest. *United States v. Knights,* 534 U.S. 112, 118-19 (2001); *see also*

*Ohio v. Robinette,* 519 U.S. 33, 39(1996). The reasonableness requirement, and the totality of the

circumstances inquiry, extends to the manner in which a search is conducted. *United States v. Banks,*

540 U.S. 31, 35 (2003).  However, with few exceptions, the question whether a warrantless search

of a home is reasonable and hence constitutional must be answered no. See *Illinois v. Rodriguez,* 497

U.S. 177 (1990); *Payton v. New York,* 445 U.S. 573, 586 (1980).

It is crucial to begin here with what is not in dispute.  There  is no dispute that Deputy Steele

was attempting to execute on a facially valid arrest warrant.  Nor is there any dispute that he

reasonably believed the home located at 201 East Townley was where Higdon resided.  As a result,

Deputy Steele was entitled to enter the residence to effectuate the arrest. *See Payton,* 445 U.S. at

603.  Further, when executing an arrest warrant in a residence, officers may perform a protective

sweep incident to the arrest to protect themselves or others. *United States v. Lauter,* 57 F.3d 212,

216 (2nd Cir.1995). *See also United States v. Magluta,* 44 F.3d 1530, 1535 (11th Cir.1995)( "in

order for law enforcement officials to enter a residence to execute an arrest warrant for a resident

of the premises, the facts and circumstances within the knowledge of the law enforcement agents,

when viewed in the totality, must warrant a reasonable belief that the location to be searched is the

suspect's dwelling, and that the suspect is within the residence at the time of entry."). Beyond that,

however, "there must be articulable facts which, taken together with the rational inferences from

those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors

an individual posing a danger to those on the arrest scene." *Maryland v. Buie,*  494 U.S. 325, 334

(1990).

In their motions, the Defendants deny altogether that a search occurred and state that "no 'protective sweep' was done by the defendants." (Bluffton Dfdt's Reply Br. at 11). Mindful that the facts are construed favorably to Higdon, it is clear that a substantial question of fact exists as to (1) whether a search was conducted at all, (2) which officers participated in the search, and (3) if a search was conducted, whether it was reasonable under the Fourth Amendment.  Higdon testified (in both his deposition and his affidavit[4]) that he saw the officers roaming throughout the home and searching through the various rooms.[5]  These facts raise a genuine issue of material fact about whether a search occurred at all and whether any search conducted was reasonable either as a valid protective sweep or otherwise.

Alternatively, Defendants insist that any search that may have occurred would have been objectively reasonable under the doctrine of exigent circumstances.   A warrantless search is permissible "when police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant." *United States v. Lenoir,* 318 F.3d 725, 730 (7th Cir.), *cert. denied,* 540 U.S. 841, 124 S.Ct. 110, 157 L.Ed.2d 76 (2003).  Exigent circumstances exist "when-in the press of circumstances beyond a police officer's control--lives are threatened, a suspect's escape looms, or evidence is about to be destroyed." *United States v. Johnson,* 12 F.3d 760,

---

[4]There is no formal motion by the Defendants to strike Higdon's affidavit although Defendants argue that the affidavit contradicts Higdon's prior deposition testimony.  There are some discrepancies between the affidavit and the deposition which counsel is free to explore at trial.  For present purposes, however, the court shall accept Higdon's version of the events by reconciling to the extent possible, the averments in his affidavit with his deposition.testimony.

[5]Defendants make much of the fact that Higdon and Archbold have conflicting versions of how many and which of the officers conducted a search.  At this stage, however, conflicts in the evidence are resolved in Higdon's favor and thus, he has set forth facts indicating that at least some, perhaps all, of the named individual defendants participated in a search of the residence. If during trial, the facts show otherwise, counsel is entitled to move pursuant to Fed.R.Civ.P. 50 for a directed verdict as to a particular defendant.

10

764 (8th Cir.1993) (citations omitted).  Whether exigent circumstances exist is typically a question

of fact.  *United States v. Richard,* 994 F.2d 244, 248 (5th Cir.1993).

To determine whether there were exigent circumstances, the court  must "analyze the

situation from the perspective of the officers at the scene" and must ask whether the officers had "an

objectively reasonable belief that exigent circumstances existed." *United States v. Marshall,* 157

F.3d 477, 482 (7th Cir.), *cert. denied,*525 U.S. 1045, 119 S.Ct. 601, 142 L.Ed.2d 542 (1998). Here,

Defendants urge that when Deputy Steele and the other officers smelled marijuana burning inside

the house, they had probable cause and an objectively reasonable belief that exigent circumstances

existed, i.e., the possible destruction and/or consumption of marijuana inside the house, to permit

a warrantless search.  This argument has some facial appeal; but, the facts read favorably to Higdon

indicate that the officers went beyond the scope of the exigent circumstances doctrine.  Indeed, once

officers secured the home and located all the persons therein capable of destroying evidence, the

exigency ceased to exist and they were required to wait for a warrant to continue their search. *See*

*United States v. Lawrence*, 2006 WL 752920, *2 (D.Minn. March 23, 2006) (finding that the exigent

circumstances that allowed the officers to enter the home for the purpose of protecting public safety

ceased to exist once the officers verified that there was no one else in the home, injured or hiding);

*United States v. Galvan,* 2001 WL 111225, *3 (D.Kan.) (D.Kan.,2001) (holding that once exigent

circumstances no longer exist, "police may not conduct a full search of what they believe to be a

crime scene without a warrant or another exception to the warrant requirement.").  Thus, from the

facts alleged here, a reasonable jury could conclude that even if exigent circumstances existed, once

the exigency was eliminated the continual rummaging through the house over the course of several

hours while awaiting a warrant – a warrant that, for some reason not explained by the parties, never

11

issued – violated the Fourth Amendment's prohibition against unreasonable searches..

Finally, Defendants argue that Higdon must show that the defendants were personally involved in the deprivation of his constitutional rights, see, *Walker v. Taylorswille Correctional Center,* 129 F.3d 410, 413 (7th Cir. 1997); *Black v. Lane*, 22 F.3d 1395, 1401 (7th Cir. 1994), and that it is not enough for Higdon to merely allege at summary judgment that all the officers present violated his rights. The Defendants also point out the Higdon has testified inconsistently in his affidavit and his deposition about which officers he saw conducting a search.

Defendants correctly note that to prevail on a § 1983 claim against multiple defendants, a plaintiff must show that each individual defendant violated his constitutional rights. *Estate of Smith v. Marasco* 430 F.3d 140, 151 (3rd Cir. 2005). Personal involvement may be shown by allegations of personal direction or actual knowledge and acquiescence. *Gossmeyer v. McDonald*, 128 F.3d 481, 494 (7th Cir. 1997) (quoting *Black*, supra 22 F.3d at 1401). Here, Defendants urge, that Higdon has not demonstrated with sufficient specificity which officers conducted an unlawful search and thus, there is no basis for liability against them. This representation, however, is not entirely accurate. Higdon testified that all of the named officers were present at the scene and that, at various times, he witnessed some or all of them searching his residence. Higdon did not say that Officer X opened the bottom dresser drawer in his bedroom or that Officer Y searched the pantry in his kitchen, but the court is not certain he needs to go that far. This is especially true in light of Higdon's testimony that he was handcuffed and instructed by the officers to remain in the kitchen as officers roamed (allegedly) freely through rooms in his home. Higdon testified that while he was in the kitchen with Deputy Steele, Steele stood in front of him to intentionally block his view of the other officers roaming through the house. This testimony supports an inference that Deputy Steele

was aware that officers were searching the house and acquiesced in the same.[6]

In *Miller v. Smith*, 220 F.3d 491 (7th Cir. 2000),  the plaintiff, a robbery suspect,  alleged that

he was attacked by police officers at a rest stop but could not identify which of the two officers

assaulted him.  The undersigned granted summary judgment to the defendants reasoning that the

plaintiff had not identified which officer was personally involved in the attack.  The Seventh Circuit

reversed stating:

> And while it is true that a plaintiff must establish a defendant's personal
> responsibility for any claimed deprivation of a constitutional right, a defendant's
> direct participation in the deprivation is not required... 'An official satisfies the
> personal requirement of §1983 if she acts or fails to act with a deliberate or reckless
> disregard of the plaintiff's constitutional rights.'  Under this rule, police officers who
> have a realistic opportunity to step forward and prevent a fellow officer from
> violating a plaintiff's rights...but fail to do so have been held liable.  Miller conteds
> that either Smith or Brower (with Dunn nearby) smacked him around while he lay
> cuffed on the ground.  If, as we are required to do at this point in the case, Miller's
> allegations are taken as true, whichever officer was not directly responsible for the
> beating was idly standing by. If Miller can show at trial that an officer attacked him
> while another officer ignored a realistic opportunity to intervene, he can recover.

*Miller*, 220 F.3d at 495 (internal citations omitted).

As noted above, Higdon and Archbold contend that while they were contained in the kitchen,

they saw and heard the defendant officers engaged in a search of the house at 201 East Townley.

Moreover, the undisputed facts show that Deputy Steele was aware that a warrant was necessary to

search the residence (indeed, the testimony is that he repeatedly spoke with the Prosecutor while he

was at the residence), he was a ware that a warrant had not issued, and further he had been instructed

---

[6]Neither of the parties addresses the concept of joint and several liability as it may apply in a case
such as this but, a review of the facts demonstrates that it may have some application here.  Joint and
several liability is a theory of recovery which requires that the plaintiff, in an action alleging tortious or
constitutionally repugnant conduct by multiple actors, establish that each defendant acted in concert to
"produce a single, indivisible injury." *Watts v. Laurent,* 774 F.2d 168, 179 (7th Cir.1985); *McKinnon v.
City of Berwyn,* 750 F.2d 1383 (7th Cir.1984).

by the Prosecutor what legal actions the police were entitled to take without a warrant.  Despite this,

Higdon  asserts that while the officers were roaming about his home, Deputy Steele attempted to

prevent he and Archbold from seeing what activities the other officers were engaged in.  These facts

give rise to an inference that Deputy Steele either implicitly authorized the search, was indifferent

to it, or was acting in concert with the other officers to conduct an unlawful search.  Given these

facts, the jury is entitled to sort out and resolve the conflicting details in the different versions of the

facts, decide which account strikes it as more credible, and draw reasonable inferences from those

facts. Certainly, in the context of all the facts in the record, including the discrepancies in Higdon's

own testimony, fair-minded persons could reasonably choose to discount Higdon's version of the

facts and credit the officers' denials that an unlawful search occurred.  This, however, cannot be

done as a matter of law on the state of the present record.

Nor can summary judgment be based upon the doctrine of qualified immunity for many of

the same reasons as above.  Qualified immunity protects officers performing discretionary functions

from civil liability so long as their conduct does not violate *clearly established* statutory or

constitutional rights that a reasonable person would know about. *See Saucier v. Katz,* 533 U.S. 194,

201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). A plaintiff seeking to defeat this defense in a Section

1983 action must show, first, that the plaintiff's rights were violated. *Id.* Second, the plaintiff must

show that the law concerning the plaintiff's asserted right was clearly established at the time the

challenged conduct occurred. *Id.* Finally, the court must determine whether a reasonably competent

official would know that the conduct was unlawful in the situation he confronted. *Id.*

Here, Higdon certainly had a right to be free from a warrantless search of his residence, and

that right is clearly established, so the only remaining question is whether a reasonable officer could

14

believe that it was lawful to conduct the search.  Defendants contend that the officers did not know

their actions were unlawful because they were relying on legal advice obtained from the Wells

County Prosecuting Attorney that they were entitled to seize items in plain view.  This is true to the

extent that the search stopped at the seizure of items in plain view.  But,  the record, as it comes to

this court, hardly establishes as a matter of law that this is where the search ended. Rather, the record

is susceptible to the view that the officers continued searching throughout the home and garage with

a view to finding more than what was in plain view.  As a result, the court cannot conclude that the

individual Defendants are entitled to qualified immunity.

**Fourteenth Amendment**

Higdon also claims that he was deprived of his property, namely $2,000 in cash, without due

process of law as required by the Fourteenth Amendment.  In their motions, defendants argue that

Higdon had an adequate state law remedy for the alleged conversion of his money, and thus he may

not pursue his property claim as a federal cause of action.

As noted, Higdon claims that some unidentified police officer took $2,000 from his dresser.

To assert a claim under the Fourteenth Amendments relating to the loss of property, a plaintiff must

not only demonstrate that he was deprived of a property right cognizable under those Amendments

but must also show that the deprivation was without due process of law. Parratt v. Taylor, 101 S.Ct.

1908, 1913 (1981); State Bank of St. Charles v. Camic, 712 F.2d 1140 (7th Cir. 1983). Under

Parratt, where a random and unauthorized act of a state official or employee has resulted in a

deprivation of property, there is no violation of due process if the state provides an adequate post-

deprivation remedy.  See also Hudson v. Palmer, 104 S.Ct. 3194, 3203-04 (1984); Burnham Prairie

Homes v. Village of Burnham, 910 F.2d 1474 (7th Cir. 1990).   When a plaintiff has available an

15

adequate state remedy, the due process requirements of the Fourteenth Amendment have been met.

The Indiana Tort Claims Act (ITCA), Ind. Code § 34-13-3-8 provides that:

> (a) Except as provided in section 9 [IC 34-13-3-9] of this chapter, a claim against a political subdivision is barred unless notice is filed with:
>> (1) the governing body of that political subdivision; and
>> (2) the Indiana political subdivision risk management
> commission created under IC 27-1-29;
> within one hundred eighty (180) days after the loss occurs.

The ITCA is intended to protect the fiscal integrity of state governmental entities by limiting their liability for tort claims resulting from actions of public employees. J.A.W. v. State, 650 N.E.2d 1142, 1153 (Ind. App. 1995).  This provision also operates to bar claims against employees of the political subdivisions. Id. at 1153.  Generally, the failure to comply with the notice requirements will subject a claim to summary judgment.  Budden v. Board of School Com'rs of the City of Indianapolis, 680 N.E.2d 543, 548 (Ind. App. 1988).

In the present case, it is undisputed that Higdon did not avail himself of any post-deprivation remedy, and thus he may not maintain a Fourteenth Amendment claim for damages.  In any event, Higdon has failed to present any evidence whatsoever that any of the defendants took his money. Thus, the defendants motions for summary judgment are granted as to Higdon's claim of a Fourteenth Amendment violation.

## **Conclusion**

Based on the foregoing, the Defendants motions for summary judgment are GRANTED as to the Wells County Sheriff's Department and the Bluffton Police Department and as to any claims

based upon the Fourteenth Amendment.  The motions are DENIED with respect to the Fourth

Amendment claims against the individual defendants.

Entered: This 5th day of April, 2006

William C. Lee<br>
United States District Court<br>
Northern District of Indiana